**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BEUTLER ENTERPRISES, INC.
D/B/A/ BEUTLER INK,

Plaintiff,

v.

RHIANNON RUFF, JENNIFER M. KARN,
SHERI COOK-SANDVE, AND ANDREW
BURNETT,

Defendants.

Civil Action No. _____

## COMPLAINT

Plaintiff, Beutler Enterprises, Inc. d/b/a/ Beutler Ink ("BEI" or "Plaintiff"), by and through

its undersigned counsel, hereby brings this Complaint for multiple causes of action against

Defendants Rhiannon Ruff ("Defendant Ruff"), Jennifer M. Karn ("Defendant Karn"), Sheri

Cook-Sandve ("Defendant Cook-Sandve"), and Andrew Burnett ("Defendant Burnett")

(collectively "the Defendants") and in support states as follows:

### NATURE OF THE ACTION

1.      This is an action for damages against the Defendants, who are former directors,

stockholders, officers, and/or key employees of BEI.

2.      The heart of this action is the Defendants' flagrant and repeated violations of certain

non-solicitation covenants contained in the Defendants' respective employment agreements, as

well as their coordinated conspiracy to attempt to destroy BEI business relationships and cause

financial harm to the company.  See March 21, 2012 Executive Employment Agreement (the "Ruff

Employment Agreement"), attached hereto as Exhibit A; May 14, 2013 Executive Employment

1

Agreement (the "Karn Employment Agreement"), attached hereto as Exhibit B; February 17, 2014 Employment Agreement (the "Cook-Sandve Employment Agreement"), attached hereto as Exhibit C; October 15, 2017 Employment Agreement (the "Burnett Employment Agreement"), attached hereto as Exhibit D (collectively, "the Defendants' Employment Agreements").

3.      Defendants' deliberate, willful, and malicious actions have caused tangible harm to BEI in the form loss of revenue, income, and profits.

## PARTIES

4.      Beutler Enterprises, Inc. is a Delaware corporation with a registered agent located at 9 E. Loockerman Street, Suite 311, Dover, DE 19901.

5.      BEI is a global digital communications agency with immediately recognizable, high-profile clients, like Google, Amazon Web Services, the U.S. Chamber of Commerce, the Motion Picture Association of America, and C-SPAN, as well as numerous lesser-known entities, individuals, and start-ups throughout the world.

6.      BEI maintains physical offices in Crozet, VA.  Beutler employees work remotely from various locations nationwide, including in Pennsylvania, California, Oregon, and Vermont.

7.      Upon information and belief, Defendant Ruff is a citizen of Ohio residing at 5030 West Blvd NW, Canton, OH 44718.

8.      Defendant Ruff was the Vice-President of Operations of BEI, who was later promoted to President, and was a minority shareholder.

9.      Upon information and belief, Defendant Karn is a citizen of Oklahoma residing at 4921 NW 161st Street, Edmond, OK 73013.

10.     Defendant Karn served as BEI's Vice-President of Operations, who was later promoted to President, and was a minority shareholder.

11.     Upon information and belief, Defendant Cook-Sandve is a citizen of Colorado residing at 316 N Corona Street, Denver, CO 80218.

12.     Defendant Cook-Sandve was the Director of Accounts, the fourth ranking position among BEI's management team.

13.     Upon information and belief, Defendant Burnett is a citizen of California residing at 4475 23rd Street, Apt. 8, San Francisco, CA 94114.

14.     Defendant Burnett was BEI's Sales Coordinator, a position which gave Defendant Burnett access to confidential client information, as well as all of BEI's potential new business leads.


## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as the amount in controversy is more than $75,000 and there is diversity of citizenship between the Plaintiff and all Defendants.

16.     Defendants have consented to the personal jurisdiction of this Court.  See Ex. A, Section 10.2; Ex. B, Section 10.2; Ex. C, Section 10.2; Ex. D, Section 12.  See also Ex. B, Confidentiality/Non-Circumvention Agreement, Section 6.

17.     Pursuant to the terms of the Defendants' Employment Agreements, venue in this Court is proper.  See Ex. A, Section 10.2; Ex. B, Section 10.2; Ex. C, Section 10.2; Ex. D, Section 12.


## FACTUAL BACKGROUND

18.     In August 2010, BEI was founded by William W. Beutler ("Mr. Beutler"), as President and Chief Executive Officer.

19.     BEI, doing business as Beutler Ink, was a pioneer in maximizing a brand's digital presence using open-source communications platforms, a highly specialized form of public relations.

20.     BEI, under the vision and leadership of Mr. Beutler, was the first digital communications company to offer comprehensive Wikipedia consultation, engagement, and strategy, offering clients services such as Wikipedia monitoring, analysis, and response planning.

21.     On or about February 18, 2011, Defendant Ruff began working for BEI as an independent contractor.

22.     A little over a year later, on or about March 21, 2012, BEI and Defendant Ruff entered into an Executive Employment Agreement for Ruff to become Vice-President of Operations.  See Ex. A.

23.     Defendant Ruff's Employment Agreement contained several confidentiality, non-compete, and non-solicitation covenants.

24.     In particular, Section 10.7 of the Ruff Employment Agreement expressly acknowledges that "all clients and customers (the 'Clients') belong to Beutler Enterprises." Further, Defendant Ruff agreed to "not solicit, nor accept requests to transfer from, Clients for a period of one (1) year" after leaving BEI's employ.  Ex. A, Section 10.7.

25.     In addition to the non-solicitation and non-acceptance of BEI's clients, Ruff agreed to not solicit nor attempt to solicit BEI's employees or contractors.  See Ex. A, Section 10.10.

26.     On or about May 14, 2013, BEI and Defendant Karn entered into an Executive Employment Agreement for Defendant Karn to become BEI's Vice President of Operations.  See Ex. B.

27.     Like the Ruff Employment Agreement, the Karn Employment Agreement contained various confidentiality, non-compete, and non-solicitation covenants.

28.     Specifically, the Karn Employment Agreement provided that Defendant Karn would "not solicit, nor accept requests to transfer from, [BEI's] Clients for a period of six (6) months" after the end of Defendant Karn's employment with BEI.  Ex. B, Section 10.7.

29.     Moreover, Defendant Karn agreed to not solicit nor attempt to solicit BEI's employees or contractors for a period of one (1) year after leaving BEI without the written consent of BEI.  See Ex. B, Section 10.10.

30.     In addition, the Karn Employment Agreement contained a separate "Confidentiality/Non-Circumvention Agreement" which further provided that Defendant Karn "shall not at any time, now or in the future, contact or attempt to contact, sell to, transact with or purchase from any [BEI]-disclosed client or potential client, without prior written permission from [BEI]" and that Defendant Karn would not communicate or meet with BEI's clients without BEI's participation or consent.  Ex. B, Confidentiality/Non-Circumvention Agreement, Section 4 (Non-Solicitation).

31.     On or about September 26, 2013, Defendant Cook-Sandve began working for BEI as a contractor.  Within a few months, on or about February 17, 2014, BEI and Defendant Cook-Sandve entered into an Employment Agreement for Defendant Cook-Sandve to become BEI's Director of Accounts.  Ex. C.

32.     In the Cook-Sandve Employment Agreement, Defendant Cook-Sandve agreed that she would not directly or indirectly engage in activities that directly competed with BEI while she was a BEI employee.  Ex. C, Section 2.

33.    Defendant Cook-Sandve also agreed not to disclose BEI's confidential or trade secret information, even after her employment with BEI ended, as well as to not solicit or accept transfers from BEI clients and to not hire, solicit, or attempt to solicit BEI employees or contractors for one (1) year after leaving BEI.  Ex. C, Sections 10.6, 10.7, and 10.10.

34.    In all three Employment Agreements, Defendants Ruff, Karn, and Cook-Sandve respectively agreed to indemnify BEI for any and all claims, damages, losses or expenses arising out of or resulting from, Defendants' breach of warranty, covenant or obligation contained in the agreements.  See Ex. A, Section 10.11; Ex. B, Section 10.11; Ex. C, Section 10.11.  See also Ex. B., Confidentiality/Non-Circumvention Agreement, Section 6 (Miscellaneous).

35.    After working together for some time, Mr. Beutler offered Defendants Ruff and Karn an ownership stake in the company as a token of appreciation for their efforts and without any obligation to do so.

36.    On or about February 12, 2016, BEI and Defendants Ruff and Karn entered into a Stockholders Agreement whereby Defendants were each given three hundred (300) shares of BEI capital stock.  See February 12, 2016 Stockholders Agreement, attached hereto as Exhibit E.

37.    Under the Stockholders Agreement, Defendants Ruff and Karn would each own 7.5 percent (7.5%) of BEI outstanding shares with Mr. Beutler retaining the remaining 85 percent (85%).

38.    Mr. Beutler even revised BEI's corporate governance documents to name Defendants Karn and Ruff as co-founding members and directors.  Amended Bylaws for Beutler Enterprises, Inc., attached hereto as Exhibit F.

39.    On or about October 15, 2017, BEI and Defendant Burnett entered into an Employment Agreement for Defendant Burnett to be BEI's Sales Coordinator.  Ex. D.

40.     As Sales Coordinator, Defendant Burnett's responsibilities included identifying potential clients, pitching potential clients, and providing new business support once a client was retained.  Ex. D, Section 2.

41.     Like the Cook-Sandve Employment Agreement, the Burnett Employment Agreement contained a provision whereby Defendant Burnett agreed to not directly or indirectly engage in activities that directly competed with BEI while he was a BEI employee.  Ex. D, Section 6.1.

42.     In addition, Defendant Burnett agreed not to disclose BEI's confidential or trade secret information, as well as to not solicit or accept transfers from BEI clients and not hire, solicit, or attempt to solicit BEI employees or contractors for one (1) year after leaving BEI.  Ex. D, Sections 6 and 7.

43.     From its inception, BEI thrived under Mr. Beutler's direction.  As digital marketing and public relations became increasingly paramount to both established and upcoming brands and as social media's influence expanded with the invention of new digital platforms, BEI evolved to offer a wide range of strategic partnerships, in addition to its cornerstone Wikipedia work.

44.     BEI's revenues continued to grow each year.  BEI's revenue in 2017 was $1.7 million.  In 2018, BEI's revenues reached over $2.1 million.  In 2019, revenues increased to $2.4 million and in 2020, revenues were $2.8 million, even in the face of economic downturn and uncertainty caused by the global COVID pandemic.

45.     Thus, over the last four (4) years, BEI's revenues trended upward an average of approximately $370,000.00/year until 2021 in which revenues are expected to be approximately $2.6 million.

46.     As set forth more fully below, it is believed and therefore averred that the sudden decline in revenue was caused by the Defendants who set into motion a chain of events for the sole purpose of causing harm to BEI.

### Defendants' Attempt to Take Over BEI

47.     As BEI grew, Defendants Ruff and Karn began to take over more of the day-to-day operations of the business.  Eventually, the two minority shareholders had full operational control of BEI.

48.     In 2019, however, Defendants Ruff and Karn began to grow increasingly dissatisfied with their professional arrangement and requested additional equity in BEI.

49.     Mr. Beutler considered Defendants Ruff's and Karn's request and offered to sell them additional shares of BEI at a discounted rate.  Defendants Ruff and Karn declined.

50.     By late 2019, Defendants Ruff's and Karn's displeasure was to the point that they were seeking other agency owners' advice on how best to structure a deal to purchase BEI.

51.     Upon information and belief, at least a portion of this planning was done on company time, using company equipment, and stored on company servers.  See, e.g., Internal Notes, created November 2019 and updated June 2020 by Defendants Ruff and Karn, attached as Exhibit G.

52.     In June or July 2020, Defendants Ruff and Karn – who were employees, officers, directors, and minority shareholders of BEI – recruited Defendant Cook-Sandve and Defendant Burnett, to form a "buyers group" and set their plan to buy the company in motion.

53.     Beginning on July 16, 2020, Defendants and their "buyers group" attempted to stage a hostile takeover of BEI.

54.     Specifically, by letter dated July 16, 2020, the "buyers group" offered to purchase Mr. Beutler's ownership interest in BEI.  See July 16, 2020 Letter of Intent to Purchase, attached hereto as Exhibit H.

55.     The Defendants took an aggressive and unreasonable tack from the start.  Their Letter of Intent (LOI) deliberately undervalued the company[1], demanded that Mr. Beutler enter into a limitless non-compete/non-solicitation agreement, restricted him from offering Wikipedia services, prevented him from using his own name, demanded that Mr. Beutler respond to the LOI within eight (8) days by July 24, 2020, and that closing should occur by October 31, 2020.

56.     In other words, they gave Mr. Beutler just a little over a week to contemplate whether or not he should sell his namesake company at a value that was far less than what the Defendants believed the company to be worth and to walk away from the business that he had built over the span of ten years.

57.     Mr. Beutler's attorney communicated to counsel for the Defendants that an eight (8) day window to consider the LOI was unreasonable.

58.     Thereafter, Defendants' counsel communicated to Mr. Beutler's counsel that a response was expected no later than August 17, 2020.

59.     On August 13 2020, Mr. Beutler, through his attorney, rejected the August 17, 2020 deadline but agreed to respond by August 20, 2020.  See August 13, 2020 Letter from Counsel, attached hereto as Exhibit J.

---

[1]     The "buyers group" initial offer was less than half the value that a BEI-commissioned valuation had determined the year prior.  See February 2019 Beutler Ink Agency Evaluation, attached hereto as Exhibit I.

60.     In the August 13, 2020 letter, Mr. Beutler reminded the Defendants of their continued legal obligations to the company, namely their fiduciary responsibilities, non-solicitation covenants and the ramifications of a coordinated "walkout" that could cause serious operational harm to the company.

61.     Despite being perplexed by the unsolicited proposition to purchase the company, given that it was not actually for sale, Mr. Beutler gave the offer fair consideration and, on August 20, 2020, responded to the Letter of Intent.  See August 20, 2020 Letter re Counteroffer attached as Exhibit K.

62.     As set forth in his August 20, 2020 Letter, Mr. Beutler ultimately decided that he was unwilling to sell the company completely but was willing to sell down to a minority shareholder position and eventually resign as chairman of the board.

63.     Mr. Beutler's August 20, 2020 letter set forth a more reasonable path to transition the company to the "buyers group" and at a more realistic fair market value.

64.     Mr. Beutler allowed the "buyers group" a period of two (2) weeks to respond to the counteroffer.

65.     On September 2, 2020, the "buyers group" sent a "Revised Letter of Intent" setting forth a new offer.  See September 2, 2020 Revised Letter of Intent attached as Exhibit L.

66.     The Defendants, in their Revised Letter of Intent continued to undervalue the company and did not allow for Mr. Beutler to remain on as even a minority shareholder of his own company.

67.     Moreover, during this period of negotiations, it was communicated that the "buyers group" would not accept any proposition or compromise in which Mr. Beutler remained with the company, even in a minority shareholder position.

68.     As a result of the Defendants' hard line and unreasonable demands, it became clear to Mr. Beutler that there was no reasonable prospect for selling the company to the Defendants that would result in a fair and equitable transaction.

69.     On September 10, 2020, Mr. Beutler informed the Defendants that he intended to stay on as CEO and chairman of the board and that he would be meeting with each of the "buyers group" members to discuss his/her future with the company.

70.     That same day, Mr. Beutler met with Defendant Ruff and advised her that her employment position was terminated and offered her a severance package if she were to cooperate and assist with a seamless transition from the company.  See September 10, 2020 Letter to Defendant Ruff attached hereto as Exhibit M.

71.     It was Mr. Beutler's intent to terminate Defendant Ruff's employment position and to offer new compensation packages, including promotions and salary increases, to Defendants Karn, Cook-Sandve, and Burnett.

72.     Unfortunately, the Defendants, had other plans.  Upon information and belief, the four of them had previously decided that if their attempted coup failed or if any of them was terminated, all of the members of the "buyers group" would walk out as a way to cause maximum operational disruption and financial harm to BEI, which is exactly what happened when Defendant Ruff was terminated on September 10, 2020 – Defendants Karn, Cooke-Sandve, and Burnett, all immediately resigned.

73.     The plan was for all of the "buyers group" members to walk out simultaneously and then to leverage the resulting leadership void and force Mr. Beutler to sell the company under their Draconian terms.

74.     Their plot became clear when, on September 12, 2020, Defendant Karn sent Mr. Beutler a threatening email wherein she stated that the value of the company, without its leadership team, would plummet $100,000.00 every 24-hour period starting on Monday September 14, 2020. See September 12, 2020 E-Mail Correspondence from Defendant Karn to Mr. Beutler, attached hereto as Exhibit N.

75.     In her email, Defendant Karn stated adamantly that any BEI attempts to hire their replacements would be "worthless."  See id.

76.     By Defendant Karn's own calculations, the company valued at $800,000.00 would become completely valueless in a matter of eight (8) days as a result of the Defendants' coordinated walkout with their co-conspirators in the "buyers group."

77.     Ultimately, Defendants' attempted hostile takeover of the company failed, and BEI moved forward. Mr. Beutler resumed day-to-day operational control and started the process of damage control of the disruption caused by the Defendants.

78.     In addition, BEI began the process of buying back Defendants' shares in accordance with the Shareholders Agreement.

**The Stock Repurchase Agreement**

79.     After terminating Defendant Ruff and after Defendant Karn resigned, the company sent correspondence to both Defendants Ruff and Karn offering to buy back their shares at a reasonable fair market value.

80.     Over the span of approximately ninety (90) days following their termination/resignation, Defendants Ruff and Karn negotiated a share buyback agreement.

81.     Despite the fact that Defendants Ruff and Karn acted in bad faith and intentionally tried to tank the company's value, the company, by and through Mr. Beutler, generously offered to buy back Defendants' 300 shares of stock at a $1 million valuation.

82.     On or about December 30, 2020, Mr. Beutler, both individually and as President of BEI, entered into a Confidential Stock Repurchase Agreement, Settlement Agreement and Release with the Defendants.   See December 30, 2020 Confidential Stock Repurchase Agreement, Settlement Agreement and Release ("Stock Repurchase Agreement"), attached hereto as Exhibit O.

83.     Under the terms of the Stock Repurchase Agreement, BEI agreed to pay Defendants Ruff and Karn $75,000 each in exchange for their stock.   See id. at Sections 1-2.

84.     The payment to Defendants Ruff and Karn would be made in two parts:  $37,500 to each Defendant on December 31, 2020 and the remaining $37,500 to each Defendant by December 31, 2021 pursuant to the terms of Promissory Notes executed by the Parties and incorporated into the Stock Repurchase Agreement.

85.     Moreover, in the Stock Repurchase Agreement Defendants Ruff and Karn, on the one hand, and BEI and Mr. Beutler, on the other, released the other from all claims and contracts as of the date of the agreement except for certain restrictive covenants contained in the Defendants' Employment Agreements.   See id. at Sections 4-6.

86.     Specifically, Section 6 (Restrictive Covenants) of the Stock Repurchase Agreement provides:

> *The foregoing notwithstanding, this Agreement shall have no effect on the non-solicitation provisions contained in paragraphs 10.6, 10.7 and 10.10 of the employment agreement between the Company and Ruff dated May 21, 2012 and/or in paragraphs 10.6, 10.7, 10.10 and Exhibit B of the employment agreement between the Company and Karn dated May 14, 2013.* Company agrees not to pursue any claim against Karn

and/or Ruff for violation of any non-competition covenant existing between Karn and/or Ruff on one hand and the Company on the other. ***Except for the non-solicitation provisions contained in the employment agreements of Ruff and Karn***, Ruff's and Karn's employment agreements are null and void and of no further force and effect, and the Company waives and relinquishes any and all rights the Company may have or may have had under those agreements.

Emphases added.

87.     Thus, the non-solicitation and non-acceptance provisions of the Defendants' Employment Agreements remained in full force and effect.  See id., Section 6.

88.     In fact, the non-solicitation and non-acceptance provisions were the only provisions of the Employment Agreements that were specifically reiterated, making it clear that those provisions were the most important provisions of the Employment Agreements and formed the foundation of the Defendants' obligations under the Stock Repurchase Agreement.

89.     Payment of the first $37,500 installments to Defendants Ruff and Karn was made by BEI shortly thereafter.[2]

90.     Payment of the second $37,500 installments to Defendants Ruff and Karn was made by BEI on December 22, 2021.

91.     Thus, BEI fulfilled its obligations under the Stock Repurchase Agreement and Promissory Notes.

92.     By contrast, the Defendants Ruff and Karn, at all times material hereto, acted in bad faith and failed to meet their obligations under their Employment Agreements, Stock Repurchase Agreement, and Promissory Notes.

---

[2]     Due to an unanticipated transfer limit, BEI was unable to wire the entire amounts on December 31, 2020.  BEI made the initial payments within just a few days and Defendants Ruff and Karn accepted those payments without objection.

**Defendants Target BEI's Employees**

93.     Upon information and belief, in the event their hostile takeover failed, the "buyers group" had a contingency plan to form a company that would compete directly with BEI.

94.     To wit, when their attempted coup failed, Defendants Ruff and/or Karn immediately formed Lumino LLC, a Delaware limited liability corporation registered on September 24, 2020.

95.     Lumino LLC d/b/a Lumino Digital ("Lumino") is a digital communications agency that provides the same and similar services as BEI.

96.     It was the Defendants' contingency plan to form Lumino and to target BEI employees and vendors because there was no express "non-compete" language in the Defendants' respective employment agreements.

97.     The Defendants formed this plan while they were still employees, directors, officers, and shareholders of BEI and, upon information and belief, did so on company time and with BEI resources.

98.     While there was no express covenant not to compete in Defendants' respective Employment Agreements[3], there were express terms therein that prohibited them from soliciting and/or hiring BEI employees and contractors.

99.     Despite these covenants expressly prohibiting the hiring of BEI employees and contractors, to staff their newly formed company, Defendants immediately hired Defendant Cook-

---

[3]     While there is no express non-compete language, both Defendants Ruff's and Karn's Employment Agreements contain language that prohibits the use of BEI's confidential information, knowledge, or data for any reason.  <u>See</u> Ex. A, Section 10.6; Ex. B, Section 10.6. "Confidential information" can reasonably be interpreted to mean BEI's business methods and client information, and using BEI's business methods and client information to compete with BEI can be deemed a violation of this covenant.

Sandve, BEI's former Director of Accounts, and Defendant Burnett, BEI's former Sales Coordinator, both of whom were under restrictive covenants contained in their employment agreements.

100.    In addition to immediately poaching Defendants Cook-Sandve and Burnett, Defendants Ruff and Karn continued their pattern of disregarding the covenants not to hire or solicit BEI employees.

101.    On March 17, 2021, Mr. Beutler learned that Defendant Ruff had offered a position of employment to then-BEI employee Richard R. "Pete" Hunt.

102.    Mr. Beutler informed Mr. Hunt that Defendant Ruff was contractually prohibited from hiring Mr. Hunt.

103.    Mr. Hunt indicated that Defendant Ruff believed that she had no such restriction.

104.    Mr. Beutler then offered Mr. Hunt a position in a new business endeavor, which Mr. Hunt ultimately declined.

105.    On March 18, 2021, through counsel, BEI advised the Defendants and their company to cease and desist their solicitation and hiring of Mr. Hunt.

106.    On March 22, 2021, Defendants' counsel responded, taking the position that any non-solicitation/non-hire covenant was unenforceable.  March 22, 2021 Correspondence from Counsel, attached as Exhibit P.

107.    Attached to the March 22, 2021 letter from Defendants' counsel was a statement provided by Mr. Hunt.

108.    In the statement, Mr. Hunt confessed that he had communicated with Defendant Burnett on September 23, 2020 and met with Mr. Burnett on October 2, 2020 in San Francisco,

CA where the two of them discussed employment possibilities.  See March 19, 2021 Statement of Richard R. "Pete" Hunt, attached as Exhibit Q.

109.    Thus, at the exact same time that BEI was negotiating the Stock Repurchase Agreement in good faith, the Defendants, by and through Defendant Burnett, their Lumino employee, were actively discussing employment opportunities with Mr. Hunt.

110.    During the months of April, May and June, BEI and the Defendants, through counsel, negotiated a consent agreement.

111.    On or about June 28, 2021, BEI consented to Defendants' hiring of BEI's employee, Mr. Hunt, on a one-time basis.  See Non-Hire Agreement – Consent to Hire Richard Hunt, attached hereto as Exhibit R.

112.    In exchange for BEI's consent, Defendants and Lumino agreed to not solicit any other BEI employees or contractors through January 1, 2022.  Id. at Section 2.

113.    In addition, Defendants and Lumino agreed that the restrictive covenants in their respective employment agreements were, in fact, enforceable and that the Defendants/Lumino would not challenge the validity of the non-solicitation and non-hire terms in the BEI employment contracts and to waive certain defenses.  Id. at Section 4.

**Defendants Target BEI's Clients**

114.    In early 2020, BEI was approached by Maximus, a government services company, to assist with the management of the brand's digital presence and to strategically leverage multiple digital platforms.

115.    In April 2020, BEI and Maximus entered into a one (1) year consulting agreement with the option to extend upon agreement of the parties.[4]

116.    Four separate Maximus Work Orders followed for BEI to provide Maximus with social media, visual content, and Wikipedia services.

117.    Over the span of nearly eight (8) months, the BEI-Maximus deal generated more than $100,000.00 in gross revenue to BEI.  In fact, Maximus was BEI's largest client at the time.

118.    During the course of the BEI-Maximus relationship, Maximus gave BEI every indication their relationship would be long-term and that their work together would continue.

119.    In November 2020, Maximus abruptly terminated its agreement with BEI, citing dissatisfaction with the work product not previously raised, as well as Maximus' own financial position.

120.    In July 2021, a newly-hired Maximus executive employee reached out to BEI to solicit its services because Maximus was dissatisfied with the work product of its current vendor – Lumino.

121.    On or about September 2, 2021, BEI's attorney sent a cease and desist notice to Defendants' counsel and asked for an explanation as to how the Defendants believed that they should be permitted to solicit and/or accept Maximus as a client given that the Defendants were bound to a non-solicitation agreement.  See September 2, 2021 Letter to Counsel re Cease and Desist, attached hereto as Exhibit S.

---

[4]      The contents of the BEI-Maximus Consulting Agreement and subsequent work orders are subject to a confidentiality clause and these documents will be filed separately under seal once an appropriate protective order is in place.

122.    In response, on October 18, 2021, Defendants' counsel sent a written statement from Heather Shingleton ("Ms. Shingleton"), Senior Manager of Branding and Communications at Maximus.  Ms. Shingleton's October 18, 2021 Statement is attached here as Exhibit T.

123.    According to Ms. Shingleton's Statement, on or about September 15, 2020, Ms. Shingleton contacted Defendant Karn via LinkedIn.  See id.

124.    As set forth above, Maximus had been a BEI client since April 2020 with BEI providing Maximus with social media, visual content, and Wikipedia services.

125.    Ms. Shingleton and Defendant Karn had worked together on Maximus projects while Defendant Karn was employed at BEI.

126.    On or about October 22, 2021, Ms. Shingleton again contacted Defendant Karn via LinkedIn, this time specifically inquiring about Lumino's services and expertise.  See id.

127.    At that time Ms. Shingleton and Defendant Karn began communicating about Maximus transferring its business to Lumino.  See id.

128.    Less than a month after Ms. Shingleton and Defendant Karn discussed Maximus shifting its digital media work to Lumino, on or about November 16, 2020, Ms. Shingleton provided notice to BEI that Maximus intended to terminate its contract with BEI effective December 31, 2020.  See id.

129.    The purported reasons Maximus gave for terminating its contract with BEI were quality issues with BEI's work product, and that Maximus was looking to do more in-house following internal layoffs and budget cuts.  See id.

130.    As stated above, prior to the November 16, 2020 notice of termination, Maximus never raised concerns with BEI over quality issues.

131.    In fact, Maximus' decisionmakers – including Ms. Shingelton – were always complimentary of Beutler's deliverables, even after Defendants' departure from BEI.

132.    On Thursday, December 31, 2020, the BEI-Maximus contract ended.

133.    The next business day, on Monday, January 4, 2021, Maximus' contract with Lumino began.  See id.

134.    It is obvious from the express admissions of Ms. Shingleton that the Defendants were actively pursuing BEI's client, Maximus, at the exact same time that they were negotiating the Stock Repurchase Agreement, and while they were obviously prohibited from doing so by the valid and enforceable non-solicitation agreements in their respective employment contracts.

135.    Upon information and belief, Maximus was not the only BEI client targeted by the Defendants.

136.     Upon information and belief, Defendants also targeted the Wyss Foundation, who was a BEI client from October 2019 through November 2020.[5]

137.    It is believed and therefore averred that the Defendants targeted other BEI clients during the time that their respective restrictive covenants prohibited them from doing so.

138.    At all times material hereto, the Defendants were deliberate in misleading BEI into believing that the Defendants would honor their restrictive covenants, all the while knowing that they had already disregarded them or immediately intended to do so.

---

[5]      The contents of the Wyss Foundation agreement are subject to a confidentiality clause and this document will be filed separately under seal once an appropriate protective order is in place.

## COUNT I

### Breach of Contract

### *Breach of Non-Solicitation Covenants Contained in the Employment Agreements*
### *Plaintiff v. Defendants Ruff and Karn*

139.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

140.    From the beginning of their employment with BEI, Defendants were under certain confidentiality, non-compete and non-solicitation covenants.  See Exs. A - D.

141.    In December 2020, Beutler agreed to let Defendants out of their obligations contained in the Employment Agreements except for the non-solicitation and non-acceptance of BEI's clients and employees/contractors.  See Ex. O.

142.    Specifically, the Stock Repurchase Agreement states that the agreement "shall have no effect on the non-solicitation provisions contained in paragraphs 10.6, 10.7 and 10.10 of the employment agreement between the Company and Ruff dated May 21, 2012 and/or in paragraphs 10.6, 10.7, 10.10 and Exhibit B of the employment agreement between the Company and Karn dated May 14, 2013."

143.    Under the terms of Defendant Ruff's Employment Agreement, she was prohibited from soliciting BEI clients for a one (1) year period after leaving BEI's employ.  See Ex. A, Section 10.7.

144.    Under the terms of Defendant Karn's Employment Agreement, she was prohibited from soliciting BEI clients for six (6) months after leaving BEI.  See Ex. B, Section 10.7.

145.     Defendant Karn breached her non-solicitation covenant when she actively engaged in discussions with Maximus starting in October 2020, while Maximus was under contract with BEI.  See Ex. T.

146.     Defendants continued to breach their non-solicitation covenants when Lumino retained Maximus as a client on or about January 4, 2021.  At that time, Defendants – who only left BEI in September 2020 – were still under the non-solicitation clauses with BEI.

147.     Defendants Ruff's and Karn's conduct further violates the implied duties of good faith and fair dealing inherent in every contract as they finalized the Stock Repurchase Agreement – which expressly retained the non-solicitation covenants – with BEI on Thursday, December 31, 2020 and started Lumino's contract with Maximus the next business day, on Monday, January 4, 2021.


WHEREFORE, as a direct and proximate result of Defendants Ruff's and Karn's breaches as described herein, Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law and under the Defendants' Employment Agreements.


## COUNT II

### Breach of Contract

*Conduct Constituting Event of Default Under the Terms of the Promissory Notes*

*Plaintiff v. Defendants Ruff and Karn*

148.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

149.    On December 31, 2020, the Parties entered into a Stock Repurchase Agreement where BEI agreed to purchase Defendants' outstanding shares of capital stock for $75,000 each. Ex. O.

150.    Under the terms of the Stock Repurchase Agreement, each Defendant was to be paid ½ of the purchase price ($37,500) at closing, which amount was paid on or about January 2, 2021 (a few days late due to a bank restriction, but without objection by the Defendants).

151.    The remainder of the stock purchase price was to be paid to Defendants within twelve (12) months pursuant to the terms of Promissory Notes simultaneously executed, and attached to, the Stock Repurchase Agreement.

152.    Under the terms of said Promissory Notes, Defendant(s) Ruff and/or Karn would be in default if she failed to comply with any "term, obligation, or condition" contained in the Promissory Notes or in any related document between Defendants and BEI.

153.    On December 22, 2021, BEI made the second payment to Defendants pursuant to the terms of the Stock Repurchase Agreement and Promissory Notes.

154.    As outlined above, Defendants' solicitation and retention of Maximus as a Lumino client violates non-solicitation covenants between BEI and Defendants which were expressly retained in Section 6 of the Stock Repurchase Agreement.

155.    When Defendants Ruff and Karn violated their non-solicitation covenants, their conduct also triggered an Event of Default under the Promissory Notes.

156.    Defendants Ruff and Karn were not entitled to payment under the Promissory Notes as they were in default.

157.    As a direct and proximate result of the Defendants Ruff's and Karn's default as described herein, Plaintiff has been damaged in an amount equal to the full value of the Stock

Repurchase Agreement, including interest and costs, plus the lost revenues of the BEI-Maximus contract, the full amount of which shall be determined at trial.

WHEREFORE, as a direct and proximate result of Defendants Ruff's and Karn's breaches as described herein, Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law and under the Defendants' Employment Agreements.

## COUNT III

### Unjust Enrichment

### *Plaintiff v. Defendants Ruff and Karn*

158.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

159.    Plaintiff made a total of $150,000.00 in payments over 2020 and 2021 to the Defendants Ruff and Karn pursuant to the Stock Repurchase Agreement and Promissory Notes.

160.    As outlined above, Defendants' solicitation of Maximus as a Lumino client and the solicitation/hiring of Defendants Cook-Sandve and Burnett and Mr. Hunt as Lumino employees constituted Event(s) of Default under the Promissory Notes.

161.    Defendants Ruff and Karn accepted and retained the payment under the Promissory Notes even though they were in default.

162.    As a result, Defendants Ruff and Karn have been unjustly enriched in the amount equal to the full value of the Stock Repurchase Agreement, including interest and costs, plus the lost revenues of the BEI-Maximus contract, the full amount of which shall be determined at trial.

163.     Under the facts of this case, it would be unconscionable for Defendants Ruff and Karn to retain the benefit of the payment given their willful actions, lack of good faith, and pattern of contempt for the parties' agreements.

WHEREFORE, as a direct and proximate result of Defendants' breaches as described herein, Defendants Ruff and Karn have been unjustly enriched and Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law and under the Defendants' Employment Agreements.

## COUNT IV

### Breach of Contract

#### *Plaintiff v. Defendants Cook-Sandve and Burnett*

164.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

165.     Both Defendant Cook-Sandve's and Defendant Burnett's Employment Agreements contained terms which prohibited Defendants Cook-Sandve and Burnett from engaging in activities that directly or indirectly competed with BEI during the course of their employment.  See Ex. C, Section 2; Ex. D, Section 6.1.

166.     Defendant Cook-Sandve's Employment Agreement contained express terms that obligated her to, at all times, act in the best interests of the company.  Ex. C, Section 1.3.

167.     Defendant Burnett's Employment Agreement contained an express term that he provide two (2) weeks' prior written notice before terminating his employment.

168.    As set forth above, while BEI employees, Defendants Cook-Sandve and Burnett, along with Defendants Ruff and Karn, conspired to take over BEI with unreasonable demands and an unsupported, deliberately low company valuation.

169.    However, in the event that Mr. Beutler refused their unsolicited offer, Defendants came up with a backup plan: to stage a mass employee walkout and with those former BEI employees form a competing company.

170.    Thus, while employees of BEI, Defendants Cook-Sandve and Burnett actively engaged in activities relating to the formation of a new company (which would eventually become Lumino) to compete with BEI.

171.    Defendants Cook-Sandve and Burnett actively participated in concocting their plan to stage a walkout while they were still employees of BEI and, upon information and belief, did so on company time and with company resources.

172.    It was the Defendants' intent to cause maximum harm to BEI so that Mr. Beutler would be pressured into selling the company to the "buyers group" under their terms.

173.    Moreover, under their respective Employment Agreements, Defendant Cook-Sandve and Defendant Burnett agreed not to disclose BEI trade secrets or other confidential information.  See Ex. C, Section 10.6; Ex. D, Section 7.  This element of confidentiality was of particular importance as it related to Defendant Burnett who, as Sales Coordinator, had access to highly sensitive company information including, but not limited to, potential new business leads. See Ex. D, Section 2.

174.    The confidentiality terms contained in the Employment Agreements continued even after Defendants Cook-Sandve's and Burnett's abrupt resignations.

175.    At all times that Defendant Cook-Sandve participated in forming the "buyers group," attempted the hostile takeover of the company, and planned and/or participated in the coordinated walkout, Defendant Cook-Sandve was acting solely in her own interests and not in the company's interests.

176.    To the contrary, all of the aforesaid actions were to the company's detriment as Defendants Cook-Sandve attempted to cause maximum disruption to the company with the intent of leveraging a personally beneficial purchase of the company at a substantial discount.

177.    The aforesaid actions were breaches of Cook-Sandve's Employment Agreement.

178.    Likewise, Defendant Burnett's participation in the coordinated walkout that was intended to force a sale of the company at a discounted price was a breach of his agreement to provide two weeks' notice, in writing, of his intent to terminate his employment.

179.    Defendant Burnett deliberately did not provide two weeks' notice because, like Defendant Cook-Sandve, it was his intent and hope that by walking out with the others, Mr. Beutler would be leveraged into selling the company under the "buyers group's" Draconian terms.

180.    Defendants Cook-Sandve's and Burnett's continued role in the establishment of Lumino, including but not limited to, accepting employment with the company and using confidential information obtained while BEI employees to solicit potential clients and provide services to Lumino clients constitutes a breach of their employment agreements.

181.    It is believed and therefore averred that, while Defendants Cook-Sandve and Burnett were Lumino employees still bound to the restrictive covenants of BEI, Defendants Cook-Sandve and Burnett directly or indirectly solicited Maximus, Wyss Foundation and/or other BEI clients despite Defendants' covenant not to do so.

182.     The aforesaid conduct of both Defendants Cooke-Sandve and Burnett were breaches of the implied duty of good faith and fair dealing in the performance of their contractual obligations.

WHEREFORE, as a direct and proximate result of Defendants Cook-Sandve's and Burnett's breaches as described herein, Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law and under the Defendants' Employment Agreements.

## COUNT V

### Tortious Interference with Contractual Relationship

#### *Plaintiff v. Defendants*

183.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

184.     On or about April 3, 2020, BEI and Maximus entered into a written Consulting Agreement for BEI to provide certain social media and Wikipedia support.  The term of the agreement was for one (1) year and could be extended by mutual written agreement.

185.     After their failed attempt to take over BEI, Defendants Ruff and/or Karn formed Lumino, a direct competitor of BEI, in September 2020.

186.     In October 2020, while Maximus was under contract with BEI, Defendants took purposeful actions to harm the existing BEI-Maximus relationship.  In particular, Defendant Karn began discussions with Heather Shingleton, Senior Manager of Maximus' Branding and Communications, for Maximus to become a client of Lumino.

187.    Shortly after this contact with Defendant Karn, Ms. Shingleton provided BEI with notice of termination of the BEI-Maximus Consulting Agreement.

188.    Maximus' purported reasons for ending the consulting agreement was due to lack of quality on BEI's end, and budget cuts on Maximus' end.

189.    The notice of termination came as a surprise to because Maximus had not expressed concerns over BEI's work product.  Indeed, all comments by Maximus had been complimentary and Maximus decisionmakers had indicated the relationship would be ongoing in the future.

190.    Thus, it is believed and averred that the reasons that Maximus provided for terminating its relationship with BEI were pretextual and meant to cover up the fact that Maximus had been targeted by the Defendants in violation of their non-solicitation and non-acceptance covenants.

191.    In accordance with the terms of the Consulting Agreement, Maximus' agreement with BEI ended on December 31, 2020, forty-five (45) days after Maximus' written termination notice.

192.    The Maximus-Lumino contract began the next business day, January 4, 2021.

193.    Defendants' actions in soliciting Maximus and accepting Maximus as a client were specifically intended to harm the existing BEI-Maximus relationship.

194.    Defendants lacked privilege or justification for their actions.

195.    BEI suffered actual damages as a result of Defendants' behavior, specifically the early termination of the BEI-Maximus Consulting Agreement and Work Orders, as well as the loss of future business with Maximus.

WHEREFORE as a direct and proximate result of the Defendants' tortious conduct as described herein, Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law.

## COUNT VI

### Civil Conspiracy

#### *Plaintiff v. Defendants*

196.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

197.    As set forth above, Defendants, acting in agreement, unlawfully solicited Maximus and potentially other clients, including the Wyss Foundation, in violation of Defendants' Employment Agreements and tortiously interfered with the BEI-Maximus relationship.

198.    Defendants acted with malice and with an intent to injure BEI.

WHEREFORE, as a direct and proximate result of Defendants' conspiracy as described herein, Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law.

## COUNT VII

### Breach of Fiduciary Duties

#### *Plaintiff v. Defendants Ruff and Karn*

199.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

200.    Since its formation and at all times material hereto, BEI has been a closely-held corporation, with shares only ever being owned by three (3) individuals.

201.    At all times material hereto, Defendants Ruff and Karn were minority shareholders of BEI with each owning 7.5 percent of the company.

202.    At all times material hereto, Defendants Ruff and Karn were corporate officers, with Defendants Ruff and Karn acting first as Vice-Presidents of Operations and later as Presidents of BEI.

203.    At all times material hereto, in their roles as corporate officers, Defendants Ruff and Karn exercised operational control over the affairs of BEI.

204.    As shareholders with operational control over the company, Defendants Ruff and Karn each owed fiduciary duties of care, loyalty, and good faith to BEI and its shareholders.

205.    Defendants Ruff's and Karn's fiduciary duties included obligations to exercise good business judgment, to act prudently in the operation of the company's business, to discharge their actions in good faith, to act in the best interest of the company and its stockholders, and to put the interest of the company before their own.

206.    While BEI previously reached a release agreement with Defendants Ruff and Karn related to their employment, resignation, and termination from the company, BEI never released its claims against Defendants Ruff and Karn in their capacity as shareholders of the company.  See Ex. O (Stock Repurchase Agreement).

207.    Defendants Ruff and Karn breached their fiduciary duties by, among other things, recruiting members of BEI management and key company employees to form a "buyers group," deliberately engaging in conduct with the express purpose of devaluing BEI and harming its on-going and future business relationships, attempting to leverage the company's devaluation for personal gain, forming a competitor company to compete with BEI while still shareholders of BEI, soliciting former and current BEI employees in violation of multiple agreements, conspiring with

and/or inducing others to violate their agreements with BEI, and failing to act in good faith during the Stock Repurchase negotiations.

208.    In particular, by Defendant Karn's own words, the staging of the coordinated walkout of BEI's management team and key employees on September 10, 2020 was done with the intent to devalue the company to nothing in a little over one week.  See Ex. N (stating that without its leadership team, BEI's value would plummet $100,000.00 every 24 hours starting on Monday September 14, 2020).

209.    Defendants Ruff's and Karn's breaches and self-dealing further shine through when Defendant Karn threatened that as a small company without its top leadership, BEI would lack the client relationships and institutional knowledge to ever fully recover from the walkout.  In other words, Defendants Ruff and Karn engaged in a course of conduct that they knew would harm the company, both immediately and for many years to come, for the express purpose of strong-arming Mr. Beutler to sell BEI to the Defendants at a grossly devalued price.

WHEREFORE, as a direct and proximate result of Defendants Ruff's and Karn's actions as minority shareholders with operational control of BEI and their breaches as described herein, Plaintiff has been damaged in an amount to conform to proof at trial, plus interest as allowed by law, and attorneys' fees and costs as provided by law.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of any issue triable of right by jury in this action, including, but not necessarily limited to, the claims asserted in the Complaint.

_____
**ANDRIS LAW, LLC**
**BRIAN M. ANDRIS, ESQUIRE**
**ATTORNEY IDENTIFICATION NO.:  93544**
**P.O. BOX 190**
**LANDENBERG, PA 19350**
**(610)-585-1256 (P)**
**(215)-525-9681 (F)**
**andrislaw@gmail.com**


**s/_____**
**JANICE L. LORRAH, ESQUIRE**
**ATTORNEY IDENTIFICATION NO.:  90009**
**P.O. BOX 190**
**LANDENBERG, PA 19350**
**(610)-585-1256 (P)**
**(215)-525-9681 (F)**
**andrislaw.jll@gmail.com**


*Attorneys for Plaintiff*


**January 4, 2022**

## <u>CERTIFICATION</u>

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

